Please all rise. Hear ye, hear ye. This Honorable Court of the Second Judicial District is now back in session. The Honorable Robert G. McLintock is presiding. We appreciate it. Call the case, please. Yes. Your Honor, the fourth and final case on the docket today is 2-25-0044 In re Marriage of Lynn D. Bernay, Mr. Atlee, Mr. Jerry S. Bernay, Mr. Spock, Mr. Cousins, Mr. Eric L. Shulman, Mr. Joel S. Cosgrove. Thank you. Mr. Shulman, you may proceed. Sure. And you can adjust the microphone, too. Good afternoon, Your Honors. Thank you for having me. I'd like to begin by asking the Court this question and answering it for you as well. And that is this. How does a spouse who is found to be evasive, not credible, and dishonest, not by one, but by two Lake County judges, receive 31 years of maintenance on a marriage of a length of 14 years based upon the date of filing? And Lynn Bernay, based upon page 2 of her brief, would answer that question by telling this Court that being not credible, untruthful, is much ado about nothing. And that's what she cited on page 2 of her brief. She referenced the Shakespearean play as what we believe is a method to sweep under the rug the findings of a lack of credibility by multiple courts. And I find it ironic because if you look up the Shakespearean play that was quoted in Lynn Bernay's brief, you'll find that the central theme in that play is deception, which is one of the central themes that runs through our particular brief as it relates to assets that were undisclosed, assets that were underutilized, and assets that were pushed out of her estate. And we believe that the record in this case on a very high level demonstrates that there were three primary reasons why the trial court's ruling was against the manifest weight of the evidence. The first reason is that there was a substantial change in circumstances here when you consider the assets and you consider the discredited and incredulous testimony that Lynn Bernay undertook here. Those were three primary classes of assets. Artwork worth $125,000, which was never utilized and was valued at zero, despite a financial affidavit which valued it by her own admission at $124,000. Number two, property located in Miami, which she owned worth $190,000 at one point in time and after being notified that her ex-husband was going to file a petition for maintenance, transferred those assets out of her name for zero consideration. $190,000 basically lit on fire. And the third issue is the inheritance. There was a $270,000 inheritance that she was potentially a recipient of, which once she was put on notice as to my client bringing in action for terminating the maintenance, suddenly disappeared. It disappeared despite the fact that in the proceedings it was established that she believed and she understood that she was a recipient under her father's estate, a father with whom, by her own admission, she had a loving relationship and a father with whom she spent very, very much time and was significant time. That's the first main reason. The second main reason we believe the evidence was against the manifest weight is this. We believe that the trial court improperly placed too much weight on Jerry's assets. No one is disputing that my client had the ability to pay. That, to me, was not the issue here. But what I believe happened here is that the trial court simply took the approach, no harm, no foul, $3,600 a month on an after-tax basis for someone who has the level of assets that Jerry does is not going to harm him. Number three, and this is the last reason, we believe that the trial court improperly gave not enough weight to the length of time that Jerry Burnet has paid maintenance to this woman. He has paid maintenance to her 31 years on a 14-year marriage as of the date of filing. In an alternate universe, if Jerry Burnet filed for divorce tomorrow, he would, by statute, pay maintenance for eight years. He, at this point in time, has paid maintenance for four times that length of time. And the problem with that is that you have a directive. You have a directive from the General Assembly, and that directive is this. They have asked this court and all of the trial courts to consider and heavily weight the length of time that someone has paid maintenance in relation to their marriage. That aspect of the statute was implemented after Burnet II, after the last decision before Judge Salve. But nonetheless, it is a clear policy mandate from this state that this court, we believe, has to consider. Now, we believe that at one point in time, the maintenance was transferred from rehabilitative of sorts to permanent. Is that correct? Absolutely. So that does not, that would not come into effect, or that would not be an issue with reference to what the maintenance would be under the new standards. It's permanent. It's permanent. I would take issue with the characterization of permanent being permanent. Permanent under the law does not mean that it's forever. It means until there's a substantial change in circumstances. And the other thing I would note, Justice Hutchinson, is this. 510A55 is a factor which says the court needs to look at the length of time that maintenance was paid in relation to the marriage. So even if you didn't want to consider the policy mandates that were dictated by the General Assembly after this case had been decided back in 2016 and 2017, you still have to look at that mandate under Section 510A55, which is a clear factor asking the court to look at the length of time that he was paid. We believe the length of time that he paid maintenance for was not only unfair, but grossly inequitable in consideration of that. Now, the other thing... Was there any evidence from a statistician relating to the statistical analysis regarding the average length of time of permanent maintenance? I.e., based upon people within a certain age bracket, the permanent outlawing will last on average X number of years? No, Your Honor, it's a good question. There was no expert testimony relative to something like that. But what there was, was there was testimony about the assets that were available to Lynn Gurney from which she could generate income to support herself. And those asset classes fell into three categories, three major categories that we believe Judge DeRue grossly ignored. The artwork worth $125,000, which by his own opinion he valued at zero. One question. Sure. That was insurance value as opposed to an appraisal type value, correct? That is correct. However, what I would add to that comment is that she prepared not one, but two financial affidavits under oath identifying that as the value of the asset. That's an admission by her. And that's an admission that we believe Judge DeRue wrongly considered when he valued it at zero. Well, that's an admission of an amount that she has that she knows it's a solid amount from an insurance policy, correct? Correct. But I think the bigger question is why was she not required to do anything with those assets? If someone had $125,000 sitting in a shoebox in a closet and it was money that was available to her, that was her choice. It's liquid. How liquid? So how liquid were these paintings? Who are our painters? That's part of the problem. We cited Shen v. Shen for the proposition that a person who is receiving maintenance cannot claim that they are entitled to maintenance when the situation they are in is incurred by choice. I would ask the court, if she has assets worth $125,000, why is there no responsibility on her to investigate what kind of return that can be? How much money she could get from there? Don't forget, this wasn't sentimental artwork. This wasn't in her home in Colorado. This was sitting in Miami. She never investigated. She never testified to it being sentimental. She gave no evidence whatsoever as to why those assets couldn't be used. And that was just one classification of asset. The other classification that she never testified to, credibly at least, was Miami. Wait. One more question about the artwork, please. It was your client's petition to terminate the maintenance, correct? Yes. So he had the burden of proof at that point. Absolutely. Did he produce any evidence concerning the actual value of that artwork? The short answer to that question is yes. Not in the context that maybe you're implying. The evidence that he produced was he submitted two financial affidavits that she had prepared under oath identifying that value. Note, to answer your question, there was no expert testimony as to what that was worth. But I don't think he was under an obligation to do that when she had an admission under oath in two signed affidavits that it was worth $124,000. Well, had it been stolen or damaged in the meantime so she got $125,000? No, that never occurred. Okay. Let me go back to Miami if I could. Okay. With respect to Miami, by her own admission, she received this asset sometime in 2015. Excuse me, 2012. And by her own admission, she transferred this asset out of her name in October of 2021. She transferred this asset out of her name in 2021 after Jerry Bernay gave her notice that he was going to be filing an action to terminate the maintenance. And what happened at that point in time was she signed a quick claim deed over to her siblings for no consideration. She basically gave away an asset worth $190,000 for nothing, and she claimed she didn't know why she was taking off title. She claimed she never asked her father about it. She claimed she never asked her siblings about it. She never spoke to an estate planning lawyer about it. And the question that I would raise for the court is this. If she didn't own an interest in this asset in the first place, which is how she testified, she said she considered it not her asset, why was her name on it in the first place? Why was her name on this asset from 2012 until she transferred it out of her name in 2021? And don't forget, the quick claim deed that she signed was prepared by her daughter, who is a paralegal working for a divorce lawyer in the city of Chicago. That evidence came through. And I would suggest to the court this isn't all a coincidence. This isn't a conspiracy that we're identifying for the court. These are real facts. And common sense will tell you that it makes clear people don't give away assets worth $200,000 for nothing. And that's what happened in this case. Which asset is this now? The Miami property, which she transferred out of her name for no consideration. We've cited cases that stand for the proposition that you don't leave common sense at the door when you walk into the courtroom. And you certainly don't drop common sense simply because Jerry Burnet has the ability to pay maintenance, which in this case he admittedly does. But let's look at the third classification of asset that was ignored by the court. And that is the $820,000 inheritance, which she was a third potential recipient of. That was worth $273,000 to her. And the testimony came out like this on the inheritance. Number one, she had a good, loving relationship with her father. Number two, she had a dad who regularly visited her from the Virgin Islands all the way to Colorado and would spend months with her at a time. She confided in her dad relative to the financial constraints that were imposed upon her. And this is the critical aspect of things. She admitted in Verde 2, and this came out in the current proceedings, she admitted that she believed and was under the perception that she was a beneficiary under her father's estate plan. So lo and behold, all of a sudden, he passes in 2023. She knows the action is coming, and all of a sudden, she's not on his estate plan. The subject never comes up with her siblings. She never explained anything about it in her testimony. And all of a sudden, in Lynn's brief, the question starts raising, well, maybe her dad didn't give her money because of X, because of Y. That's all speculation. She never testified to any of those things. It's not credible to believe that a child who has a warm and loving relationship and is supported by her parents is suddenly disinherited for no reason. The coincidences here are too strong to ignore, and we believe that Judge DeRue was incorrect when he ignored them. And when you consider the fact that she did not utilize the artwork, that she pushed Miami out of her estate, and that we believe she surreptitiously deferred assets that she was entitled to receive by way of an inheritance, when you add the value of those assets plus Massachusetts, there's $609,000 of assets that were basically ignored by the trial court. That's not even touching Colorado, which is worth $920,000. There was a lot of rhetoric in the piece about, well, she shouldn't have to sell Colorado. If you look at the facts here, with the assets that she has relative to what I've just described, she can generate a conservative investment off of those assets to meet her reasonable needs, and that is in pages 35 to 38 of her brief. We've outlined it. But to highlight it so we know what the math is. Did the trial court ever make any findings specifically relating to what I believe is your claim, that the ex-spouse was attempting to defraud a creditor, so to speak, and that she was intentionally diminishing her estate so as to continue to receive or possibly increase maintenance? Because that seems to be what your argument is. That is absolutely what I'm arguing. Absolutely, Justice McLaren. And to answer your direct question, Judge Daru said he found it questionable, and he found it suspect of her statements regarding the lack of any inheritance. So he doubted it. That's what's so troubling about this opinion. He doubted her credibility. He questioned the testimony and the nature of the testimony. And if he questioned it, then he didn't carry it far enough to take the reasonable inferences from that can be drawn from these facts and lead it to the conclusion, which is that we demonstrated she had a substantial change in circumstances based upon the increase in her assets. Don't forget, Judge Salve, in his opinion, found her to have, can I just finish this one point? Judge Salve found her to have $270,000 in assets under what we believe the evidence showed. As I just described with those three asset classes, she is at $1.5 million. Even by Judge Salve's, or excuse me, Judge Daru's own admission, she had assets worth $700,000. And he ignored the artwork, he ignored Miami, and he ignored the inheritance. Any other questions? No, not right now. Thank you. All right, thank you. Mr. Ostroff? Thank you. Good afternoon, Your Honors. Good afternoon. I do want to correct one statement that Mr. Shulman made, that the maintenance I paid is not after-tax maintenance. It's deductible maintenance that Mr. Burnett pays to Mrs. Burnett. In this court's 2017 decision, it noted how Lynn Burnett has never been able to come close to the lifestyle of the marriage, while Jerry Burnett has exceeded it. The only change in that circumstance is that the gulf has expanded. Lynn is retired. She's still physically impaired. She lives in the same home and drives the same car that she did back in 2016 and 17. Jerry has three mortgage-free homes around the country as part of $5 million in assets, and an income that he doesn't even use to pay the maintenance with. The burden of proof was on him, as the court said in 2017, and it is again now. And the law is still that when permanent maintenance has been awarded, unless or until a termination event occurs, it is paid until there is a substantial change in circumstances. Are the children all finished with college and professional education? Yes, they are. What would really constitute a change in circumstances, a substantial change in circumstances, was Lynn Burnett now having to sell her home of 23 years and her possessions. If she sold her home as a single-person homeowner, she would, first of all, pay off the mortgage, which is around $200,000, pay taxes on the gain, that is in excess of $250,000 as a single person, and invest some of the rest in a new place to live. And while there was no evidence about this, well, there was evidence that her house is 1,100 square feet in Boulder, Colorado, and it is now worth $900,000. But if an $1,100 square foot house is worth $900, I think it's pretty safe to say it would be pretty hard for somebody to replace that with whatever money they might have left after the liquidation that I just spoke of of most of the funds. And she would then be living on an income of $1,600 a month and hope she doesn't outlast what's left. In terms of what she has now, the Carbone case, which we cited in our brief, is almost directly on point in terms of the financial situation she has, warranting the continuation of maintenance. There the payee had $900,000 in non-income producing assets and a monthly income expense deficit, and that entitled the wife to receive $3,000 a month in maintenance. Those are almost the same facts that exist here. Their position is she should sell her assets, which I am not aware of any court ever requiring someone to do, but particularly in these circumstances, it seems an untenable act. Are you saying that the argument of the appellant is unprecedented? I'm saying the position that somebody should sell their assets, especially their fundamental assets like their house, is required for them to still receive maintenance if they could get enough money out of selling those assets to produce enough income to reduce the maintenance payments. I don't think there's any case that supports that theory. And every case, obviously, in these circumstances, stands on its own facts, and the facts here are that this woman is in her mid-70s, she's lived in that house for 25 years, and to force her to move because maybe she'll have a few hundred thousand left over, which in today's interest rates might get her $20,000 a year, I think it's disheartening that somebody would take that position, I think. And Mr. Burnett has repeatedly said that his assets and income don't matter. If that were the case, I don't think he would have gone to such great lengths to try to obscure them. Right after the 2017 case, he moved seven figures worth of assets into his wife's mutual trust and then claimed in this case, and Judge DeRue didn't buy it, that, well, that's not mine anymore, including two mortgage-free pieces of property, one in the Berkshires and one in Chicago. And on his financial affidavit, he did not include the $70,000 in income he was taking out of his retirement funds annually, saying he just considered that just moving money around. And as I said, I mean, there's a certain irony in that, in that he did testify, I don't use my income to pay the maintenance, but yet the maintenance he pays is deductible from his income. In terms of the length of the payment, by definition, indefinite maintenance means the payor keeps paying until there's a termination event or a substantial change in circumstances. As this court itself said in 2017. Thus, the law embraces the possibility that the obligation will last well beyond the length of the marriage or any statutory formula. There is no actuarial table that we use to say, well, somebody should be able to stop paying when they're 75 or 80 or 77. It depends solely on whether, what the financial circumstances of the two people are as to whether or not there's been a substantial change in circumstances. And there's no black line test that applies other than the examination of all the factors of 504 and 510, which Judge DeRue made, and none of his findings were contrary to the manifest way to the evidence. And the Watson case, which we cited, supports that principle. There, the woman had become quite psychiatrically disabled. She was supposed to file a review petition. It was filed late. The judge dismissed it. And this court ruled you can't do that to somebody under these circumstances, leave that, you know, cast their fates to the wind when they are dependent upon the maintenance to sustain. And our case, a standard of living well below the standard of living that the marriage had. Now, they made they've made many allegations against Lynn Burnet here. And I'll start with the supposed inheritance. I think that I'm going to presume that Mr. Shulman pulled the $270,000 figure out of the fact that I think the testimony was that the father, who was 90 years old, had around $900,000. And we're going to assume that under the law of where he where he passed away, the three children would split that in thirds. I don't know that anybody ever showed that to be true. But the burden of proof about the inheritance was on Jerry. And the inferences the trial trial judge draws from the evidence will not be overturned unless there is an abusive discretion or it's contrary to manifest way to the evidence. When the trial took place, Jerry Burnet had the estate documents. The testimony was that they had got they had gotten the estate documents from, I guess, the probate court where Jerry, where the father had passed away. If those documents had shown that Lynn Burnet was going to be entitled to $270,000, they would have introduced them into evidence and they did not. The inference that a nine-year-old, the inference that Judge Jerusalem defined the most satisfying, for lack of a better word, was that a nine-year-old man might well have been manipulated by the siblings who lived with him at the expense of one who lived thousands of miles away. And that's hardly a preposterous inference to make. It happens all the time. And while Jerry also says that Lynn had no reason why she should have been excluded from the death benefits of the Florida title, he ignores that any reason that may have existed was not hers. But those are the people which, even if they told her why she was going off the Florida title, which, by the way, she never paid any consideration to be on that title. And her testimony was, when they put me on the title, I didn't say anything. When they wanted me to be off the title, I didn't say anything. But even if they had told her, she would not have been allowed to testify to that anyway. Was there ever a time when the alleged interest in the property was delivered by a legal document, properly executed? Well, assuming that she had... It would be prima facie evidence of a transfer of interest or title. Well, she testified she always signed whatever documents the family told her to sign. Now, there was evidence that she did sign a deed to relinquish her interest. So, assumedly, there was a deed that put her on title, or that would not have happened. But she had no control over the property anyway. To say that, if she was still on the property, where is she getting the money anyway? She's just the one-third owner of a piece of property in Florida. Is she supposed to go down there and file a partition suit, so that Jerry Burnet might be alleviated of some of his responsibility to pay maintenance? And there was also a property in Massachusetts that she had, and still has, a tiny interest of $22,000. Again, she's not the sole title holder. And that's not cash to her, and she can't turn it into cash. So, you know, and another possible inference that could be made here is that, with the artwork she got and the $75,000 contribution to purchasing her home, which her father had given her, and he was giving her $12,000 a year in gifts at some point in time, that that was deemed by people as sufficient for her to have received from the father prior to his death. And the opposing inference, which Mr. Shulman wants the court to adopt, is that the whole family conspired to make sure Jerry would have to continue to pay his maintenance. And that relies on the untenable proposition that the whole family thought it would make all the difference in the world to the court that if Lynn got an inheritance, that would be the end of her maintenance. And it also means that they thought if she, or part of the plot was, if she didn't get an inheritance and the court believed that that was some sort of scheme, that they would then, and so terminate her maintenance, then they'd give her the money, you know. And I think that requires a huge leap of imagination. Well, I wouldn't say it relates to imagination. Okay. It may relate to conspiracy. Right, but it would be a conspiracy. It's a conspiracy with, you know. In fact, what you allege might transpire did transpire. I'm not sure. They're alleging what transpired was they all took her out of the inheritance. But it was a sham. Right. They're saying it was a sham, but it would have to be a sham conducted in the belief that that would make a difference as to whether Jerry Burnet had to pay maintenance or not. And then, as I said, if the court had ruled that, well, I'm going to terminate her maintenance because I think she should have gotten this $270,000, then they would have given her the money, you know, because otherwise she has no inheritance and she has no maintenance. And I don't think that anybody can saddle these people with that conspiracy. And in terms of Miss Burnet's credibility, yes, Judge DeRue made a couple of comments about it, but basically he said that she was an unsophisticated person, that he did not believe that the initial mistakes or omissions from her early financial affidavits were a purposeful effort to deceive the court. And as Strager v. Packaging Corporation says, as we cited, if a court determines that it was not a purposeful act so the court wouldn't be able to decide the case on the merits, it's not a sanctionable act. And I am not – well, they didn't address fees, so I guess I don't need to be there. With the amount of maintenance that is currently being paid to her, does she currently meet her average monthly expenses? She has a minor shortfall between her $1,600 Social Security check and the $3,600, which is taxable to her that she receives from Mr. Burnet. She has a minor shortfall. Without that $3,600, she's doomed. She does have – she started her job later in life, so she does have some pension or some retirement? No, she had – the testimony was she had a retirement fund, but when Judge Salvey – it wasn't a big one, but when Judge Salvey terminated her maintenance, she had to use up her retirement fund to replace not getting the maintenance until this court reversed that. But she was reimbursed about $90,000 at that point, correct? Yes, eight years ago. That is correct. Well, I would like another 30 seconds. Well, I have another question. Okay. Does she still have a condo in the Loop or in Chicago? I don't think she ever had a condo in the Loop, but I know she doesn't have one now.  She may have at some point, but to my knowledge, she doesn't have one now. Okay. And, you know, the last time we were here, part of Mr. Burnet's position was that Ms. Burnet should drive 60 miles each way to get a better job in Denver in her then-14-year-old car to reduce his maintenance. Now it should – she should uproot her entire life at her age and in her physical condition to alleviate him from an obligation that he meets without any adverse impact on his standard of living. Thank you for your attention. I have one question. Is there a date in the future for a review? No. Not in any existing court order right now. So one of the circumstances that has not changed is both these people are still alive. And until one of the – And I think it's an issue of money from her dog expenses. And the point of the exercise that I went through before, demonstrating the assets that she either deferred receipt of, didn't utilize, or ignored existing, is that those assets have the ability to generate income from her. And so I disagree because I believe she has a surplus, and I've demonstrated in our brief. On paper, she has a surplus. Yes. In her bank account, does she have a surplus? Not in her bank account. But when you consider the assets that she deliberately and surreptitiously deferred out of her estate, the answer to that question is yes. Counsel, you indicated that there was testimony that her father had been giving her $12,000 a month. Or did I miss something? There was evidence in the record in the first proceedings before Judge Salve that she received money from her father. And that he supported her. And what I suggested to the court was, this to me demonstrates the closeness of the relationship, that this man supported her. I appreciate that. Yeah. But isn't it just as likely that as he's giving her $12,000 a month, he in his mind is ticking that off from her money. But she never testified to that. But where you're making an inference and asking us to speculate in your direction, I'm saying isn't there just as reasonable an explanation the other way? I wouldn't use the word speculate. I would use the word drawing reasonable inferences from concrete facts that demonstrate this woman.  Concrete facts. He's giving her money every month. He has three children. It was a gift. It was a gift. Okay. That's what occurred here. It seems like your argument is suggesting that she didn't even contemplate how many pins you can stick into the head of an angel. What you are suggesting is, or I should put it more in the nature of fact, she didn't do anything of a discernible procedure that indicated that she felt the need to liquidate, consolidate, invest, whatever. Why would she do that? It's only going to hurt her case when it comes to terminating maintenance. That isn't my point. My point isn't whether she did these things, whether there's a checklist that you can go down and say she didn't do this, she didn't do that, she didn't do this. To me, she could have gone down the list and checked them off and said, I don't want to do this, I don't want to do that, I don't want to do that. But I don't think the record displays whether she did what you said, which was she never contemplated this. She never thought about it. She never contemplated, meditated, or acted upon the result other than what the apparent result is, she decided not to. And if she decided not to, that doesn't necessarily mean that you can assume that she didn't contemplate it. Using your metaphor of an angel, if this woman was an angel, and she was Mother Teresa and she testified on the stand, never impeached, no lies, no lack of credibility, then, okay, I could understand some speculation or some skepticism about our position, but the opposite is true in this case. Judge Salve did not believe this woman. Judge DeRue did not believe this woman. And I would ask the court, why should you believe her if the prior judge did not believe her? Why did they rule in her favor? That's a good question. And I believe Judge Salve, I don't know if you know this or not, I was the judge who tried the case before Judge Salve. You did? Yes. I was the one who successfully convinced Judge Salve to terminate her litigation. You were the attorney. I was the attorney who tried it on behalf of Judge Salve. You said you were the judge. I'm sorry, I misspoke. Maybe I should have been. It would have been a better result. But I was the one who tried the case before Judge Salve. I was the one who convinced him to terminate maintenance in the first place. And the problem that I have, in part, is let's not forget, Judge Salve made a ruling in that case. He terminated the maintenance. And one of the things that never came out in that ruling or in this court's decision was the fact that this woman owned almost a $200,000 asset in 2015 at the time that case went down. I didn't know it. You didn't know it. Judge Salve didn't know it. But Judge Salve made a legal mistake. He did not look at what Judge Winters had done in the preceding case. And that was the basis of our reversal. You were the lawyer in that case. You should be well aware of that. I am well aware of it, but respectfully. It has nothing to do with the amount of money she had. It was Salve said permanent maintenance is terminated. That's not how you terminate permanent maintenance. Well, I don't know that it necessarily applies in this instance. But to answer your question, just so I can give you my perspective on it. Well, you just got mine. Yeah. And I believe that the crux of that case was predicated upon the fact that it was foreseeable that his retirement was contemplated. And that was one of the underpinnings of the appellate court's decision, a decision, I'll remind you, Clark, that we put in our brief that we believe was legislatively overturned with the addition of the language in 510. Any other questions? No, sir. All right. Thank you for your time. I appreciate it. We'll take the case under advisement. If there are no further cases on the call, court is adjourned.